NO. 07-00-0577-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



NOVEMBER 12, 2001


______________________________



JOHN EDWARD MAPP, JR.
,




 Appellant


v.



THE STATE OF TEXAS, 




 Appellee

_________________________________



FROM THE 262ND DISTRICT COURT OF HARRIS COUNTY;



NO. 847,675; HON. MICHAEL ANDERSON, PRESIDING


_______________________________



Before QUINN, REAVIS, AND JOHNSON, J.J.

 John Edward Mapp, Jr., appellant, appeals his conviction for failing to register as
a sex offender. His sole point of error concerns the legal and factual sufficiency of the
evidence underlying the jury's verdict of guilty. We affirm the judgment.

Standard of Review


 The applicable standards of review are well known and need not be reiterated. It
is enough to cite the litigants to Clewis v. State, 922 S. W.2d 126 (Tex. Crim. App.1996)
and King v. State, 895 S.W.2d 701 (Tex. Crim. App.1995) for a discussion of same. Next,
the indictment obtained by the State and accusing appellant of criminal conduct read:

 [O]n or about May 31, 2000, did then and there and unlawfully while a
person required to register under the Offender Registration Program,
Chapter 62, Texas Code of Criminal Procedure, intentionally and knowingly
fail to comply with said program, to-wit, after having a reportable Conviction
for the offense of Sexual Assault of a Child on March 18, 1997, did fail to
report in person to and provide the local law enforcement authority, namely
the City of Houston Police Department, of an intended change of his address
with his anticipated move date and the new address prior to the seventh day
before the intended change.


Application of Standard


 Statute provides that:

 [i]f [a sex offender] required to register intends to change address . . . the
person shall, not later than the seventh day before the intended change,
report in person to the local law enforcement authority with whom the person
last registered . . . and provide the authority and the person's anticipated
move date and new address . . . . 

Tex. Code Crim. Proc. Ann. art. 62.04(a) (Vernon Pamphlet 2001). It is undisputed that
appellant was a person required to comply with art. 62.04(a) of the Code of Criminal
Procedure. Furthermore, evidence appears of record disclosing that appellant knew of his
duty to comply with the statute and initially informed the authorities that his address was
978 Lucky. This was the home of his sister, with whom he allegedly resided after leaving
prison. That he so resided there was re-confirmed by him in April of 2000. However,
appearing of record is testimony of a police officer with the Houston Police Department
disclosing that, during April and May of 2000, she attempted to contact appellant at the
address on six occasions, without success. Other evidence disclosed that 1) appellant's
sister moved from the locale, 2) a third-party moved into the abode located at 978 Lucky
in February 2000, 3) according to this new tenant, appellant had not resided there since
she moved in, 4) this new tenant also disclaimed knowing appellant, 5) appellant had not
lived with his sister for over 70 days, and 6) appellant, after discovering that a warrant had
been issued for his arrest, contacted law enforcement officials in the Summer of 2000 and
provided them with a new address.

 The foregoing constitutes some evidence upon which a rational jury could conclude,
beyond reasonable doubt, that appellant intentionally and knowingly failed to register as
required by art. 62.04(a) of the Code of Criminal Procedure. And, though other evidence
contradicted that mentioned above, including appellant's own testimony that he continued
to reside at 978 Lucky though he also stayed with his girlfriend at another locale, the
contradictory evidence merely created questions of fact for the jury to decide. It did not
render the jury's verdict clearly wrong or manifestly unjust.

 Accordingly, we overrule appellant's contentions and affirm the judgment.


 Brian Quinn

 Justice


Do Not Publish.






 11,
1996, the Amarillo police dispatcher sent Lieutenant Kenneth Farren to Kenna's residence. As
Farren arrived at the residence, appellant approached, apparently coming from a deserted schoolyard
to the west of the house, told the officer she was the one who called, and said "[h]e's been stabbed." 
When asked who the victim was, she replied that it was her stepfather. When Farren asked appellant
"[y]our father stabbed your mother or your mother stabbed your father, " her reply was "I stabbed
him." Because she was a juvenile, Farren said he did not question her further, but put her in a patrol
car while the investigation ensued. Later, as police prepared to take her to the police station, Farren
checked her for weapons as well as for physical evidence such as any transfer of blood from the knife
or from the victim that might connect her with the crime scene. When asked to display her hands,
appellant responded, "[o]h no, I was wearing gloves."

 The officers transported appellant to the police station about 3:46 a.m. and, upon their arrival
at approximately 3:54 or 3:55 a.m., they took her to the juvenile division. Sometime thereafter,
Potter County Justice of the Peace Terry Miller arrived, gave appellant her juvenile warnings and,
at 5:15 a.m., both Judge Miller and appellant signed a form acknowledging the warnings had been
given and received. Detective Terrance Tracy then took a written statement from appellant which
was completed at 6:05 a.m. About 9:25 a.m., Amarillo Municipal Judge Donna Clayton came to the
police station. Because a detailed discussion with her convinced Judge Clayton that appellant
understood the nature and contents of the instrument, Judge Clayton signed the statement. There was
testimony that although appellant was alone in the room for some periods of time, detectives and
other personnel were in close proximity.

 Initially, as a juvenile, appellant was charged with engaging in delinquent conduct. 
Subsequently, however, the Potter County Court at Law No. 1 waived its juvenile jurisdiction over
appellant, the case was transferred to the 320th District Court of Potter County, and appellant was
indicted for murder. It is that action that appellant challenges in her first issue. In doing so,
appellant claims the State neither pled nor presented proof that the Potter County Court at Law "had
been 'designated' a juvenile court." Specifically, she contends it is a fact issue as to whether that
court had been designated as a juvenile court, and because of this, "the designation by the juvenile
board of Potter County must have been alleged and affirmatively proven" in order to show the
juvenile jurisdiction of the County Court at Law. She bases that argument on the premise that "a
juvenile court is not one of general jurisdiction, [and] its power to act is derived exclusively from
the statutory authority taken from the Texas Family Code." In support of her proposition that
factual proof was required, she cites and relies upon In the Matter of A.S., 875 S.W.2d 402, 403
(Tex.App.--Corpus Christi 1994, no writ).

 Because the question before the A.S. court was different from that now before us, we do not
agree with appellant and, therefore, we find A.S. is not dispositive of her first issue. Appellant's
reliance, however, warrants a discussion of the case. In A.S., the juvenile was charged with engaging
in delinquent conduct and the court held that in order to show the court's juvenile jurisdiction, the
prosecution must both plead and prove the age of the juvenile. Id. En route to its decision, the
appellate court explained that the power of a court to adjudicate juvenile delinquent conduct is
derived exclusively from the statutory grants of power delineated in the Family Code. Id. Thus, it
was necessary to prove the age of the juvenile accused of delinquent conduct in order to show the
minor was subject to, and could be acted upon under, the Juvenile Justice Code. Id.

 At the outset, we note that section 51.02(6) of the Family Code defines a "juvenile court" as
a court that has been designated under section 51.04 of the Family Code to exercise jurisdiction over
proceedings under the Juvenile Justice Code. Tex. Fam. Code Ann. § 51.02(6) (Vernon 1996). In
relevant part, section 51.04(b) of the Family Code provides that the county's juvenile board shall
designate one or more courts, which includes county courts at law, as juvenile courts. Tex. Fam.
Code Ann. § 51.04(b) (Vernon 1996). Appellant claimed that In the Matter of R.A.B., 525 S.W.2d
892 (Tex.Civ.App.--Corpus Christi 1975, no writ), because the record did not specifically reflect that
the trial court had been designated as a juvenile court, it was without jurisdiction. The appellate
court disagreed and, in doing so, pointed out that relevant statutory authority authorized certain
courts, such as the trial court in that matter, to act as juvenile courts. Id. at 895. That being so, it
reasoned, the burden was upon R.A.B. to show the trial court had not been properly designated, and
he had failed to do so. En route to that decision, the court noted that the juvenile orders showed they
were made in a cause pending in "THE JUVENILE COURT OF HIDALGO COUNTY" and they
were signed by the judge "Sitting as a Juvenile Court in said County." Id. at 895-96. Likewise, the
relevant orders in this case show they were "IN THE POTTER COUNTY COURT AT LAW #1 OF
POTTER COUNTY, SITTING AS A JUVENILE COURT." Suffice it to say, we agree with the
reasoning of the Corpus Christi court. In this case, it was the burden of the juvenile to show the trial
court had no jurisdiction to enter its transfer order. Under this record, she did not sustain her burden. 
Appellant's first issue is overruled.

 In her second issue, appellant challenges the admission of her written statement into
evidence. In doing so, she claims its admission violated sections 51.09, 52.02, and 52.025 of the
Family Code, as well as violating Article 1, section 10 of the Texas Constitution and the Fifth
Amendment to the Federal Constitution. Specifically, she argues the officers violated section 52.02
of the Family Code because they failed to take her immediately to a juvenile detention facility or a
juvenile processing office. Additionally, she asserts that although Judge Clayton and Judge Miller
are magistrates, they are not juvenile judges acting under the authority of the Juvenile Justice Code. 
Moreover, she claims, there is nothing in the record that shows they had been appointed by the Potter
County Juvenile Board to receive children taken into custody or that the board had authorized them
to give juvenile warnings.

 In considering this second issue, our first task must be to decide if the length of time between
appellant's detention and her arrival at the juvenile processing office violated section 52.02(a) of the
Family Code. At the time with which we are concerned, the statute read: 

 § 52.02. Release or Delivery to Court


 (a) A person taking a child into custody, without unnecessary delay and without first
taking the child to any place other than a juvenile processing office designated under
Section 52.025 of this code, shall do one of the following:


 (1) release the child to a parent, guardian, custodian of the child, or other responsible
adult upon that person's promise to bring the child before the juvenile court as
requested by the court;


 (2) bring the child before the office or official designated by the juvenile court if
there is probable cause to believe that the child engaged in delinquent conduct or
conduct indicating a need for supervision;


 (3) bring the child to a detention facility designated by the juvenile court;


 (4) bring the child to a medical facility if the child is believed to suffer from a serious
physical condition or illness that requires prompt treatment; or


 (5) dispose of the case under section 52.03 of this Code. (2)


Tex. Fam. Code Ann. § 52.02(a) (Vernon 1996).


 Without citation of relevant authority other than the statutory language "unnecessary delay,"
appellant argues that the 50 minutes she sat in the patrol car at the scene before she was taken to a
juvenile processing office violated that statutory requirement. The State responds that the delay was
unavoidable because the officers were engaged in attending to the victim and obtaining preliminary
information from witnesses. Thus, it reasons, because of these circumstances, the delay was not
"unnecessary" within the purview of the statute. See Littlefield v. State, 720 S.W.2d 254 (Tex.App.--Beaumont 1986, pet. ref'd).

 It is the rule, of course, that when a police officer deems it necessary to take a child into
custody, the procedures specified in the Family Code must be followed. In the Matter of R.R., 931
S.W.2d 11, 14 (Tex.App.--Corpus Christi 1996, no writ). Because of its subjective nature,
determining whether an "unnecessary delay" occurred must be on a case-by-case basis. Thus, the
decisions of other courts are helpful to us in conducting our analysis.

 In Comer v. State, 776 S.W.2d 191 (Tex.Crim.App. 1989), the juvenile was arrested at his
home at 6:24 p.m. After a brief stop at a departmental office to pick up necessary waiver and
statement forms, officers took him to the home of a justice of the peace, arriving there shortly after
7:00 p.m. Pursuant to Family Code requirements, the juvenile was warned by the justice of the peace
and then returned by the officers to the sheriff's department by 7:30 p.m. Once at the sheriff's
department, the juvenile gave a full written confession. At 9:16 p.m., the juvenile was returned to
the justice of the peace's home where he, with the officers in the next room, signed the confession. 
The high court held that the approximate three-hour period of time it took to secure the confession
violated section 52.02(a); thus, the confession was not admissible. Id. at 196.

 In In the Matter of D.M.G.H. 553 S.W.2d 827, 828 (Tex.Civ.App.-- El Paso 1977, no writ),
the court also held a juvenile confession inadmissible. In that case, a pregnant 16-year-old juvenile
was arrested around 12:30 p.m., held in custody at a police substation until 7:25 p.m., then taken
before a magistrate, and was not delivered to a juvenile detention facility until 10:20 p.m. During
this time period, no meals were given to the juvenile. The State's rationale for the delay was that
"fifteen pages of No. 1 police reports were being filled out," and it was also time consuming to take
the juvenile to the detention facility. The court held this rationale insufficient to justify the delay. 
Id. at 828. 

 In this case, the juvenile was taken into custody about 3:00 a.m. and was placed in the police
car at that time. However, she was not taken to the juvenile processing office until some 45 or 50
minutes later. The written statement was not completed until 9:30 a.m. That the officers were
investigating the stabbing is an inadequate justification for the delay in transporting her to a duly
designated juvenile office. Under the strict requirements of section 52.02 of the Juvenile Code, we
cannot hold that she was taken to the juvenile facility without the "unnecessary delay" prohibited by
the Code. Accordingly, we must hold appellant's written confession was inadmissible.

 Having determined the written confession was inadmissible, we must next determine if its
admission requires reversal. Appellant contends that the admission of the confession was
"constitutional error" within the purview of Rule of Appellate Procedure 44.2(a), which requires that
in such instances reversal is required unless the reviewing court "determines beyond a reasonable
doubt that the error did not contribute to the conviction or punishment." Appellant cites no legal
authority for that proposition and we have found none. The record before us demonstrates that prior
to the making of the written confession, appellant was given all warnings constitutionally required. 
Nothing in the record indicates nor does appellant claim that the confession was induced by improper
coercion or other improper inducements. In sum, if appellant had been an adult, under this record,
the confession would have been admissible. The only reason it was not admissible was because the
statutory 52.02 "unnecessary delay" requirement was not met. Thus, we conclude, because the error
was statutory rather than a lack of compliance with constitutional prerequisites, the effect of the error
must be analyzed under Rule of Appellate Procedure 44.2(b), which provides:

 (b) Other Errors. Any other error, (3) defect, irregularity, or variance that does not
affect substantial rights must be disregarded.

 

Tex. R. App. P. 44.2(b) (Vernon 1999).


 Therefore, we must next determine if the admission of the confession affected a substantial
right of appellant. Our Court of Criminal Appeals has explicated that a substantial right is affected
"when the error had a substantial and injurious effect or influence in determining the jury's verdict."
King v. State, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997) (citing Kotteakos v. U.S., 328 U.S. 750,
776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Determining whether an error had a substantial
and injurious effect on a verdict is not an easy task for a reviewing court and, of necessity, must be
made on a case-by-case basis.

 Our Rule 44.2(b) was taken from Federal Rule of Criminal Procedure 52(a) without
substantive change. That being true, cases which have interpreted the federal rule are helpful to us. 
The seminal case concerning non-constitutional error is the one cited and relied upon by the King
court, namely Kotteakos v. U. S., supra. In that case, the Supreme Court explained the analysis to
be applied by the reviewing court is that if it is sure after reviewing the record that the error did not
influence the jury, or "had but a very slight effect," the verdict must stand. Kotteakos, 328 U.S. at
764-65.

 Additionally, in making our analysis, we must keep in mind that in doing so, we should not 
focus upon the propriety of the outcome but upon the integrity of the process leading to conviction. 
See Harris v. State, 790 S.W.2d 568, 587 (Tex.Crim.App. 1989). In that connection, we note that
appellant's oral confession, which we believe was admissible, did not give any of the details or
reasons why she did so, but was merely a statement that she had stabbed Winegar. However, her
written confession contained a detailed recitation of the events leading up to Winegar's death. That
being so, we must consider the collateral implications of those details. 

 Because of its importance to our decision, we set out appellant's entire written confession. 
It is as follows:

 My name is Dana Marie Contreras. I am 15 years old. My date of birth is 1/23/80. 
I live at 904 N. Florida, Amarillo. My phone number is 376-9935. I am a student at
Tascosa High School. I am in the 10th grade. Yesterday, January 10, 1996, I got
home from school and fixed myself something to eat. I live at home with my mom,
Kena [sic] Andrews, my sister, Sueleta [sic] Andrews, and my mom's boyfriend,
Neal Winegar. After getting something to eat I went to my room. I did some of my
homework. I fell asleep for a couple of hours. After waking up, I went out to the
living room to be with the family. I was watching TV. Neal was on the phone. My
mother was sitting there, talking with Neal as he talked on the phone. I do not know
where my little sister was at. I really did not talk to them. I just sat there. I fixed
myself something to eat. After I finished eating, I went to my room. I just stayed in
my room listening to my radio. A little while later, I decided to go [sic] the laundry. 
I needed clothes for school. I put the clothes in the washer and went back to my
room. I changed out purses for the one I was going to carry. When the washer was
done, I put the clothes in the dryer. I cleaned my shoes while the clothes were drying. 
My mom and Neal were watching TV while I was doing all of this. I was trying to
figure out what clothes to wear. My mom was now in the bedroom and Neal was in
the living room. I got out the ironing board and was ironing my clothes to wear to
school. Neal went to the bathroom. When he went by my room, Neal told me that
I needed to go to bed. This made me mad when he did this to me. [I] went ahead and
finished my pants. Neal went into the bedroom and told my mother. My mother
went to the bathroom and then stopped by to see me. She stood in the doorway
getting on to me, [for] getting smart with Neal. She left and went back to the
bedroom. I could head [sic] her and Neal talking. I could not hear all they were
saying. I had finished the ironing and was in bed. I was laying there thinking. I
could still hear my mom and Neal talking. I could not hear all they were saying. 
They were up for a long time. I was thinking about Neal and the things he does to
make me mad. I was wondering if they had a letter a friend had written to me. They
had been reading my letters from him. I got up and went to the kitchen. I got a drink
of water. There was a knife sitting there on the cabinet. I got a drink of water. I took
the water and the knife back to my room. The knife was a carving knife. I took the
knife to the room and sat it on a chair. I got back into bed. My mom and Neal were
still awake in the bedroom. I was just laying in bed thinking. I was waiting for them
to go to bed so I could go and do this. My mother got up, went to the bathroom,
turned off the radio in my little sister's room, and then came into my room. She
turned off the light in my room. She doesn't normally come into my room. I was
awake, but rolled over so she could not see that I was awake. She went back to the
bedroom. It is like 2 in the morning now. I waited until things got quiet. I got up
and put the mask on. I went to my little sister's room and tucked her in. She kind
of woke up. I covered her up. I left her room and was shutting her door. She told
me to leave it open. I went back to my room and turned on my light. I found some
gloves under the chair in my room. I put the gloves on and grabbed the knife. I went
into the living room and petted the cat. I was listening to see if mom and Neal were
still awake. I could not hear much. Finally I could hear that my mother was asleep. 
When I heard that my mother was asleep, I went into the bedroom. I had pulled the
mask down. I was wearing the mask and gloves so I would not get any blood on me. 
I went over to the right side of the bed. This is where Neal was sleeping. I looked
at the clock and it was 2:51. When I walked in the room, Neal was laying on his
stomach. He rolled over. I thought that he was going to wake up. I stopped to see
if he was going to wake up. I heard him start snoring. I went up to the bed. I was
thinking that I was not going to put up with it any more. I stabbed him in the chest
area with the carving knife. I left the knife in him. I went to leave the room. I heard
Neal gasp and left the room. I tried to close the door but there were some clothes in
the way. I went to the living room and picked up the phone. I dialed 911 and set the
phone down on the chair. I did not talk on the phone. I went to my room and took
the gloves and mask off. I just dropped them as I walked. I could hear my mother
talking. I went and shut my little sister's door to her room. I went outside and
walked over to the school. I sat down on the steps and just watched the house. 
Finally the light came on in the house. The porch light came on and someone opened
the door. I saw the police cars pull up. I walked over to them. They asked me if this
is where the call had come from. I told them it was. They asked me who had called
and I told them that I had. They asked me about guns in the house. I told them some
hunting rifles were in the house. They walked off to the house. Two more officers
came up to me. They asked me who had stabbed him. I said, "I did." They asked
me to have a seat in the police car. They left me there and went into the house. I am
giving this statement willingly and voluntarily. No promises or threats have been
made to me. I have read the above and it is true and correct to the best of my
knowledge.


 At trial, appellant testified that she stabbed Winegar "[b]ecause I didn't want him to be with
my little sister and I didn't want him to come into my room anymore. I wanted him to stop." She
requested, and was denied, a charge on necessity. Relevant to the trial court's denial of that defense,
among other incriminating statements in her written confession, appellant said she waited until
Winegar was asleep, so that she "could go and do this." She also stated that she had gotten a knife
out of the kitchen earlier and set it down in her room which, at the least, was a strong indication of
premeditation and also bore upon the question of necessity. Finally, in her statement, while Winegar
was asleep and as she approached his bed, right before she stabbed him, she said she "was not going
to put up with it any more."

 The necessity defense is codified in our Penal Code section 9.22. In relevant part, it provides
that conduct is justified if "the actor reasonably believes the conduct is immediately necessary to
avoid imminent harm." Tex. Penal Code Ann. § 9.22(1) (Vernon 1994). To be entitled to
submission of the defense, a defendant must present some evidence of his reasonable belief of and
affirmative evidence of imminent harm. A generalized fear of harm is not sufficient to raise the issue
of imminent harm. Brazelton v. State, 947 S.W.2d 644, 648 (Tex.App.--Fort Worth 1997, no pet.). 
Appellant's trial defense was conducted upon the theory that Winegar was forcing himself sexually
upon her sister. At trial, she averred that she heard Winegar enter her sister's bedroom and shut the
door, and she then heard the bed springs pop and thought Winegar was in her sister's bed. Because
of these things, she thought her action was immediately necessary to protect both herself and her
sister. Dr. Anthony Arden, a defense witness, testified that in his professional opinion, appellant
reasonably believed her conduct was necessary to avoid imminent harm to herself and her sister. 

 As a general rule, determination of the reasonableness of an accused's belief is a question
of fact, Fitzgerald v. State, 782 S.W.2d 876, 885 (Tex.Crim.App. 1990), and should be viewed from 
the accused's standpoint at the time he acted. Juarez v. State, 886 S.W.2d 511, 514 (Tex.App.--Houston [1st Dist.] 1994, pet. ref'd). A defendant is entitled to submission of an affirmative
defensive instruction on every issue raised by the evidence, regardless of whether the evidence is
strong, feeble, unimpeached, or contradicted. Sanders v. State, 707 S.W.2d 78, 80 (Tex.Crim.App.
1986). 

 As contrasted to appellant's trial testimony, the written statement makes no reference to any
immediate need for protection and, as we have noted, gives impetus to a conclusion that the stabbing
was not the result of any immediate necessity for protection, but was actually undertaken after ample
time for reflection. In the face of the defense testimony, we cannot say that the content of the written
confession was not relied upon by the trial judge in denying the necessity defense, nor can we say
that it did not have any effect upon the jury in making its decision as to the guilt of appellant. In
sum, we cannot say its admission did not affect a substantial right of appellant. Appellant's second
point is sustained.

 Because the sustention of appellant's second point will require a reversal of the trial court's
judgment, there is no necessity to discuss the other issues presented by appellant in her original
appeal and in her motion for rehearing.

 Accordingly, appellant's motion for rehearing is granted, our original opinion is withdrawn
and this opinion substituted. For the reasons we have stated, the judgment of the trial court is
reversed and the cause remanded for further proceedings consistent with this opinion.


 John T. Boyd

 Chief Justice


Publish.
1. Appellant testified that she had been ironing in her room and Winegar had come in and told 
her to go to bed because she was making too much noise.
2. The method of disposal provided by section 52.03 is not material to our discussion of this
case.
3. Apart from constitutional error.